# 24-1684-cv

# United States Court of Appeals
### *for the*
# Second Circuit

DEMOS P. DEMOPOULOS, as Trustee and Fiduciary of the Local 553 Pension
Fund, Local 553 Deferred Compensation Fund and Local 553 Benefits Fund,
VICTOR CASTELLANO, as Trustee and Fiduciary of the Local 553 Pension
Fund, Local 553 Deferred Compensation Fund and Local 553 Benefits Fund,
STEVEN GOLDMAN, as Trustee and Fiduciary of the Local 553 Pension Fund,
Local 553 Deferred Compensation Fund and Local 553 Benefits Fund, VINCENT
THEURER, as Trustee and Fiduciary of the Local 553 Pension Fund, Local 553
Deferred Compensation Fund and Local 553 Benefits Fund, JEFF HAMMOND,
as Trustee and Fiduciary of the Local 553 Pension Fund, Local 553 Deferred
Compensation Fund And Local 553 Benefits Fund,

*Plaintiffs-Appellees,*

– v. –

UNITED METRO ENERGY CORP., AKA United Apollo Petroleum
Transportation Corp., AKA United Apollo Transportation Corp., UNITED
APOLLO PETROLEUM TRANSPORTATION CORP., UNITED APOLLO
TRANSPORTATION CORP.,

*Defendants-Appellants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-APPELLANTS

ROBERT R. PERRY
JACKSON LEWIS P.C.
*Attorneys for Defendants-Appellants*
*United Apollo Petroleum*
*Transportation Corp. and United*
*Apollo Transportation Corp.*
666 Third Avenue, 28th Floor
New York, New York 10017
(212) 545-4000

DAVID M. PIXLEY
JACKSON LEWIS P.C.
*Attorneys for Defendants-Appellants*
*United Apollo Petroleum*
*Transportation Corp. and United*
*Apollo Transportation Corp.*
Park Center Plaza I
6100 Oak Tree Boulevard, Suite 400
Cleveland, Ohio 44131
(216) 750-0404

CP COUNSEL PRESS   (800) 4-APPEAL • (333189)

## <u>RULE 26.1 (a) DISCLOSURES</u>

Pursuant to Fed. R. App. P. 26.1(a), Defendants United Metro Energy Corp., United Apollo Petroleum Transportation Corp., and United Apollo Transportation Corp. certify that their direct or indirect parent corporation is United Refining, Inc. and no publicly held corporation owns ten percent or more of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

JURISDICTIONAL STATEMENT .............................................................1

STATEMENT OF ISSUES ..........................................................................1

STATEMENT OF FACTS ............................................................................2

    The Parties and Related Background Information .................................2

    The Obligations of Signatory Employers Under the Master
    Contracts ...............................................................................................4

    Appellants 2013-2015 Contributions For Three Specified
    Employees Previously Employed By Apollo .......................................6

    The 2013-2017 Bulk Contract Covering all of Appellant's Drivers .............8

    Appellants' Contributions Under The 2017 MOA ..............................9

    The Arbitration Proceeding .................................................................11

    Procedural History ...............................................................................12

SUMMARY OF ARGUMENT ..................................................................13

LEGAL ARGUMENT ...............................................................................17

    I.     STANDARD OF REVIEW ...............................................17

    II.    BY OVERLOOKING EVIDENCE SHOWING THAT
          APPELLANTS' CONDUCT WAS INCONSISTENT WITH
          THE MASTER CONTRACTS, THE DISTRICT COURT
          ERRED IN HOLDING THAT APPELLANTS ADOPTED
          THE MASTER CONTRACTS FOR ALL DRIVERS BY
          THEIR CONDUCT ............................................................18

    III.   EVEN IF APPELLANTS HAD ADOPTED THE MASTER
          CONTRACTS BY THEIR CONDUCT (WHICH THEY DID
          NOT), THE DISTRICT COURT ERRED IN ORDERING
          APPELLANTS TO SUBMIT TO AN AUDIT THAT
          EXCEEDS THE SCOPE OF THE FUNDS' TRUSTEES
          AUDIT AUTHORITY .......................................................30

CONCLUSION ...........................................................................................35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*,
230 F.3d 569 (2d Cir. 2000).................................................................. 18, 31

*AGL Indus. v. Iron Workers Local 40*,
No. 14-cv-03618 (FB) (RLM), 2014 U.S. Dist. LEXIS 176833
(E.D.N.Y. Dec. 22, 2014) ........................................................... 20-21, 22

*Alaska Trowel Trades Pension Trust v. Rady Concrete Constr., LLC*,
No. 3:15-cv-00061 (SLG), 2016 U.S. Dist. LEXIS 151853
(D. Alaska Nov. 2, 2016) ...................................................................22

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001)...............................................................31

*Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund
v. P.P.L. Constr. Servs. Corp.*,
No. 12-cv-3940 (DLI) (RML), 2015 U.S. Dist. LEXIS 39855
(E.D.N.Y. Mar. 27, 2015) ...................................................................19

*Brown v. C. Volante Corp.*,
194 F.3d 351 (2d Cir. 1999)................................................................19

*Brown v. Dominic Prisco Transp., Inc.*,
No. cv-95-1121 (ADS), 1997 U.S. Dist. LEXIS 23709
(E.D.N.Y. Aug. 16, 1997) ..................................................................28

*Central States, Southeast and Southwest Areas Pension Fund
v. Central Transport*,
472 U.S. 559 (1985) ................................................................... 30, 31

*Empire State Carpenters Welfare v. Conway Constr. of Ithaca, Inc.*,
No. 07-cv-2259, 2018 U.S. Dist. LEXIS 57609 (E.D.N.Y. 2018) .............. 18, 28

*Firesheets v. A.G. Bldg. Specialists*,
134 F.3d 729 (5th Cir. 1998) .............................................................22

*Garcia v. Heath*,
74 F.4th 44 (2d Cir. 2023) .................................................................17

*Gittens-Bridges v. City of New York*,
   No. 22-810, 2023 U.S. App. LEXIS 33872 (2d Cir. 2023) .................................17

*Hongxia Wang v. Enlander*,
   No. 17-cv-4932 (LGS), 2018 U.S. Dist. LEXIS 37910
   (S.D.N.Y. Mar. 6, 2018) ...............................................................................19

*International Brotherhood of Electrical Workers, Local 532
   v. Brinks Construction*,
   825 F.2d 207 (9th Cir. 1987) .......................................................................29

*Klos v. Lotnicze*,
   133 F.3d 164 (2d Cir. 1997) ..........................................................................31

*Koller Plumbing Co. v. Sheet Metal Workers' Int'l Assoc., Local Union No. 162*,
   No. CV F-89-716 (EDP), 1990 U.S. Dist. LEXIS 18706
   (E.D. Cal. Aug. 14, 1990) ...........................................................................22

*Moglia v. Geoghegan*,
   403 F.2d 110 (2d. Cir 1968) ........................................................................29

*New York State Teamsters Conf. Pension & Ret. Fund v. Boening Bros.*,
   92 F.3d 127 (2d Cir. 1996.)......................................................... 16, 30, 31

*Panek v. Cimato Bros. Constr., Inc.*,
   No. 02-cv-333(A), 2007 U.S. Dist. LEXIS 76359 (W.D.N.Y. Oct. 15, 2007) ...21

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)...........................................................................12

*Stapleton v. Barnett Crane Design & Engineering*,
   725 Fed. Appx. 28 (2d Cir. 2018).................................................................18

*Steelmasters, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural
   Ornamental & Reinforcing Iron Workers, AFL-CIO*,
   No. 05-cv-259 (MDG), 2008 U.S. Dist. LEXIS 7687
   (E.D.N.Y. Feb. 1, 2008) ...............................................................................15

**Statutes & Other Authorities:**

28 U.S.C. § 1292(a)(1)....................................................................................1

29 U.S.C. § 1021(f)(1) ....................................................................................1

29 U.S.C. § 1104(a)(1)(D) .............................................................................30

29 U.S.C. § 1132(e)(1)............................................................................1

29 U.S.C. § 1132(e)(2)............................................................................1

Restatement (Trusts) § 164(a)..............................................................30

## JURISDICTIONAL STATEMENT

This is an appeal from a Judgment entered on May 23, 2024, in favor of Plaintiffs-Appellees' motion for summary judgment and an Interlocutory Order for Defendants-Appellants' to submit their books and records to an audit by Plaintiffs. (SPA-1-17). The United States District Court for the Eastern District of New York had jurisdiction under 29 U.S.C. § 1132(e)(1) and 1132(e)(2). 29 U.S.C. § 1132(e)(1) provides that district courts have "exclusive jurisdiction of civil actions under [ERISA]" brought by fiduciaries of defined benefit plans, as defined under 29 U.S.C. § 1021(f)(1). Here, Plaintiffs are fiduciaries of the Local 553 Pension Fund, the Local 553 Deferred Compensation Fund, and the Local 553 Benefits Fund. (A-68-84; A-95-112). 29 U.S.C. § 1132(e)(2) grants jurisdiction to district courts in the district where the plan is administered, where the alleged breach took place, or where defendants reside or may be found. Jurisdiction is proper in the Eastern District of New York because Defendants reside in Kings County, which is within the Eastern District's jurisdiction. (A-68-84; A-95-112).

Defendants timely filed a Notice of Appeal on June 21, 2024. (A-1603). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.  Did the District Court improperly grant Plaintiffs' Motion for Summary Judgment because there is a genuine issue of material fact as to whether

Defendants adopted the 2010-2013 and 2013-2016 Master Contracts[1] through their conduct?

2.    Did the District Court improperly order Defendants to submit to an audit of all of their "books and records to determine whether contributions are missing under the 2010-2013 and 2013-2016 Master Contracts"[2]?

## STATEMENT OF FACTS

### The Parties and Related Background Information.

Plaintiffs-Appellees are Trustees of the Local 533 Pension Fund (the "Pension Fund"), the Local 533 Deferred Compensation Fund (the "Deferred Compensation Fund") and the Local 533 Benefits Fund (the "Benefits Fund" and collectively with the Pension Fund and the Deferred Compensation Fund, the "Funds"). (A-68-84 ¶¶ 5,7). Plaintiff Demos P. Demopoulos ("Demopoulos") has been a Trustee of the Funds since 1990 and has been the Secretary-Treasurer and Executive Officer of Local 533 of the International Brotherhood of Teamsters (the "Union") since 2004. (A-137-138; A-143; A-924:9-925:6). Plaintiff Victor Castellano has been a Trustee of the Funds since 2013 and a Business Agent for the Union from February 2013 until his retirement on May 31, 2022. (A-250:8-10, 19-

_____

[1] Defined below as the "Master Contracts."
[2] SPA-15. The District Court properly held that "because Defendants' obligations under the 2016-2019 Master Contract are limited to the five drivers, Plaintiffs may only audit books and records pertaining to those five employees." (SPA-15-16).

24). Plaintiffs Vincent Theurer and Jeff Hammond are employer Trustees of the Funds. (A-137).

Defendants-Appellants United Metro Energy Corp. ("UMEC"), United Apollo Transportation Corp. ("UAT") and United Apollo Petroleum Transportation Corp. ("UAP" and collectively with UMEC and UAT, "Appellants") are each foreign corporations authorized to do business in New York. (A-68-84 ¶¶ 8-10).

The actions of the Pension Fund trustees are governed by the Local 533 Pension Fund Amended and Restated Trust Agreement (the "Pension Fund Trust Agreement"). (A-862-891). The actions of the Deferred Compensation Fund trustees are governed by the Local 533 Deferred Compensation Fund Trust Agreement (the "Deferred Compensation Fund Trust Agreement"). (A-843-861). The actions of the Benefits Fund trustees are governed by the Local 533 Benefits Fund Trust Agreement (the "Benefits Fund Trust Agreement" and, collectively with the Pension Fund Trust Agreement and the Deferred Compensation Fund Trust Agreement, the "Trust Agreements"). (A-819-842).

In March of 2013, UMEC purchased certain assets of Apollo Petroleum Transportation, Inc. ("Apollo I") and Apollo Petroleum Transportation, LLC ("Apollo II" and collectively with Apollo I, "Apollo") out of bankruptcy. (A-296:2-297:6; A-304:24-305:8; A-320-329 ¶ 5; A-401:19-25; A-402:3-403:6; A-407:13-17). When UMEC purchased the assets of Apollo, it did not assume any collective

3

bargaining agreements Apollo had with the Union. (A-297:3-25; A-320-329 ¶ 10; A-408:8-409:5).

**The Obligations of Signatory Employers Under the Master Contracts.**

The Master Contracts were multiemployer CBAs between the Union and the New York Heating Oil Association, Inc. (the "Association"). (A-139:15-141:7; A-430-453; A-454-474; A-475-497; A-1367-1390; A-1391-1411; A-1412-1434). The Association is a multiemployer association that engages in collective bargaining with Local 533 on behalf of its authorizing members. (A-320-329 ¶ 7). The Master Contracts cover employees classified as Oil Drivers, Terminal Maintenance Employees, Servicemen, and Dispatchers. (A-432; A-456; A-477; A-1369; A-1393; A-1414). Under the terms of the Master Contracts, signatory employers are obligated to contribute to the Funds for covered work. (A-440; A-443; A-463; A-465-466; A-485; A-487-488; A-1377; A-1380; A-1400; A-1402-1403; A1445; A-1447-1448). Appellants did not authorize the Association to bargain on their behalf with any labor union organization, including the Union. (A-320-329¶ 8). The Association never executed any of the Master Contracts on behalf of Appellants. (A-320-329 ¶¶8-10). Appellants never executed any of the Master Contracts directly. (A-320-329 ¶¶10, 34; A-134:4-17).

The Benefits Fund Trust Agreement provides that the Trustees "may examine and audit the pertinent books and records of each *Employer* whenever such

examination of audit is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust." (A-819-842, Art. V § 1, Art. VII § 1) (emphasis added). The Benefits Trust Agreement defines "Employer" as "each employer who *has duly executed a Collective Bargaining Agreement and who is a signatory to the Agreement and Declaration of Trust, or is otherwise legally bound to such Agreements by virtue of having executed an authorization in favor of the New York Oil Heating Association, Inc.*" (A-819-842, Art. 1, § 1) (emphasis added).

The Deferred Compensation Fund Trust Agreement provides that "[t]he Trustees may at any time audit the pertinent records of any Employer." (A-843-861, Art. III §7(a)). The Deferred Compensation Fund Trust Agreement defines "Employer" as "each employer who *has duly executed a Collective Bargaining Agreement or is otherwise legally bound to such Agreement by virtue of having executed an authorization in favor of the*" New York Oil Heating Association, Inc. (A-843-861, Art. 1, § 1) (emphasis added).

The Pension Trust Fund Agreement provides that "[e]ach *Employer* shall promptly furnish to the Trustees on demand such payroll records and data with respect to individual employees as the Trustees may reasonably require in connection with the administration of the" Pension Fund. (A-862-891, Art. V, § 3) (emphasis added). The Pension Trust Fund Agreement defines "Employer" as "*each employer who has duly executed a Collective Bargaining Agreement and who is a*

signatory to this agreement, and also any employer who hereafter executes such an agreement." (A-862-891, Art. I § 1) (emphasis added).

Appellants are not signatory to the Benefits Fund Trust Agreement, the Deferred Compensation Fund Trust Agreement, or the Pension Fund Trust Agreement. (A-320-329, ¶ 35).

**Appellants 2013-2015 Contributions For Three Specified Employees Previously Employed By Apollo.**

Prior to Appellants' asset purchase, Apollo compensated three employees (Paul Senatore ("Senatore"), John Spaight ("Spaight), and Thomas Galasso ("Galasso" and collectively with Senatore and Spaight, the "2013 Specified Employees")) pursuant to the terms of the 2010-2013 Master Contract, including making contributions to the Funds on their behalf. (A-280:12-283:12; A-320-329 ¶ 16; A-410:5-411:6; A-413:23-414:6, A-417:17-24). After the asset purchase, Appellants continued to employ the three 2013 Specified Employees. (A-320-329 ¶ 18; A-410:20-411:17; A-415:23-416:18). Only one of the 2013 Specified Employees (Senatore) was a driver. (A-174). Appellants continued Apollo's prior "historic" arrangement with the Union to pay *only* the 2013 Specified Employees (and none of Appellants' other union employees) according to the terms of the 2010-2013 Master Contract until each retired, terminated or was promoted. (A-306:13-22; A-410:20-411:17; A-415:23-416:24; A-926-928; A-940-941; A-958-959; A-963-964; A-972-973). Appellants did *not* execute the 2010-2013 or 2013-2016 Master

6

Contracts at this time or at any other time. (A-320-329 ¶ 19; A-192-193;A-408:19-409:5).

Shortly after the asset purchase, Spaight was promoted to a managerial position, so Appellants never made any contributions to the Funds on his behalf. (A-174; A-179; A-280:23-281:24; A-410:10-15; A-973). Appellants made contributions to the Funds on Galasso's behalf from March 2013 until he retired in April of 2013. (A-533-544 ¶¶ 13-14). Appellants made contributions to the Funds on Senatore's behalf from March 2013 until he retired in May 2015. (A-533-544 ¶¶ 13, 15-17; A-681-687; A-688-693).

The Funds conducted an independent payroll audit for the year 2013 and found that contributions to the Funds were only required for covered work performed by the 2013 Specified Employees. (A-533-544 ¶¶ 22-23; A-675-680). The Funds' auditors concluded that Appellants owed contributions in the amount of $761.98 for work performed by the 2013 Specified Employees during March-December 2013. (A-675-680). Similarly, audits for the years 2014 and 2015 found that contributions were owed only for Senatore (the last of the 2013 Specified Employees remaining)[3] until Senatore's retirement in May 2015. (A-533-544 ¶¶ 24-25, 28; A-681-687; A-688-693). Other than the contributions for Senatore, the 2014

---

[3] As noted above, contributions to the Funds were not required after Speight's promotion (March 2013) and Galasso's retirement (April 2013.)

and 2015 Audit Reports determined that *no additional* contributions were due and owed to the Funds. (A-533-544 ¶¶ 25-26, 29; A-681-687; A-688-693). The 2015 Audit Report concluded that "[UAT] has only one driver, terminated 2015" and "the company has no more employees covered under the collective bargaining agreement with Local 553 Pension, Benefits and Deferred Compensation Funds." (A-688-693). Following Senatore's retirement in May 2015 through November 2017, Appellants did not submit any remittance reports or make any contributions to the Funds. (A-320-329 ¶ 23; A-175-176; A-531:3-12; A-533-544 ¶¶ 17-19; A-944; A-960; 963-964; A-973-974).

**The 2013-2017 Bulk Contract Covering all of Appellant's Drivers.**

After the March 2013 asset purchase, Appellants continued to employ approximately fifty drivers who were previously employed by Apollo. (A-320-329, ¶11; A-406:10-13; 415:1-21). In 2013, Appellants voluntarily recognized the Union as the collective bargaining representative of the drivers and entered into a CBA with the Union (referred to as the "2013-2017 Bulk Contract") with the Union which covered by its express terms covered all of Appellants' drivers. (A-163-165; A-297:13-25; 298:3-23; A-320-329 ¶¶ 12-14; A-330-339). The 2013-2017 Bulk Contract was effective from March 5, 2013 through February 28, 2017. (A-163-165; A-330-339). The 2013-2017 Bulk Contract did *not* require Appellants to contribute to the Funds on behalf of any of the drivers. (A-330-339). Other than the 2013-2017

Bulk Contract, Appellants did not enter any additional agreement with the Union or the Funds until May 2017. (A-182; A-227:3-5; A 320-329 ¶ 24; A-418:14-22). Appellants did not make any contributions to the Funds on behalf of any employee between Senatore's retirement in May 2015 and November 2017. (A-183; 1-185; A-188; A-320-329 ¶ 28).

Between 2015 and 2017, the Union made several attempts to persuade Appellants to place at least some drivers onto the Master Contract, but Appellants vehemently refused to do so. (A-177; A-180; 186; 188; A-203:14-25; 204:8-19, A-245:21-248:3). Appellants consistently told the Union "no, no, no, no" when asked to either sign the Master Contract or agree to cover any drivers thereunder. (A-188).

**Appellants' Contributions Under The 2017 MOA.**

During the negotiations for the renewal of the 2013-2017 Bulk Contract, the Union requested a limited concession from Appellants to contribute on behalf of five drivers. (A-184; A-228:21-229:3, A-303:11-17, A-320-329 ¶ 27). Appellants eventually agreed to cover five drivers under the Master Contract. (A-188-189; A-228:21-229:3, 625:11-17, A-320-329 ¶ 29). This agreement was memorialized in a Memorandum of Agreement effective March 1, 2017 through February 28, 2021 (the "2017 MOA") which expressly stated that "[t]he Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master Contract as of March 1, 2017 expiring December 15, 2019 which shall *initially* cover

9

five (5) drivers performing retail delivery work who shall be chosen by seniority from the current bulk seniority list." (A-183; A-320-329 ¶ 28; A-423:19-425:25; A-340-342). By email dated November 1, 2017, the Union specified the five drivers who would be covered under the Master Contract (the "2017 MOA Specified Employees") via the 2017 MOA. (A-533-544 ¶¶ 31-32). The "bulk seniority list" referenced in the 2017 MOA covered all drivers and was the only seniority list that was maintained by Appellants. (A-165). These specific drivers were purposefully chosen by the bargaining parties "because they happened to be on top of the seniority list." (A-234:7-14).

From November 2017 through December 2017, Appellants completed the Funds' remittance forms and made contributions only on behalf of the 2017 MOA Specified Employees. (A-533-544 ¶ 33; A-694-700). When the Funds audited Appellants for the year 2017, the audit report determined that Appellants had satisfied all of its contribution requirements. (A-533-544 ¶ 45; A-792-799). Appellants continued to provide contributions and remittance reports for the hours worked by the five 2017 MOA Specified Employees until one retired on December 13, 2019 and another January 3, 2020. (A-533-544 ¶¶ 35, 37, 39; A-711-750, A-751-789; A-976:17-977:5). Appellants thereafter continued to contribute only for the three remaining 2017 MOA Specified Employees. (A-938:18-939:3; A-976:17-24; A-979).

10

**The Arbitration Proceeding.**

In January of 2020, the Union sought to "repopulate" the two vacant spots in the 2017 MOA Specified Employees with two additional drivers. (A-892-894; A-935; A-953-956; A-965-966). When Appellants refused, the Union initiated an arbitration identifying the following issues: (1) "Is the Employer obligated to apply the terms of the Master Contract for its five most senior retail delivery drivers? If so, what shall be the remedy?" and (2) "Do the UMEC drivers who perform retail delivery work fall under the Master Contract? If so, what shall be the remedy?" (A-895-897; A-898-899). The Arbitrator ultimately arbitrated the dispute between UMEC and the Union based on the following stipulated issue: "Did the Company violate Paragraph 11 of the 2017 Memorandum of Agreement? If so, what shall be the remedy?" (A-900-920). The Arbitrator conducted hearings on October 3 and November 16, 2022 and denied the Union's grievance. (A-900-920). On February 3, 2023, the Arbitrator issued an award holding that the parties did not agree to compensate all drivers who engaged in retail delivery work and that the agreement for Appellants to initially contribute for the five 2017 MOA Specified Employees meant the number would not be increased beyond five. (A-900-920).

On March 22, 2023, the Union filed a Complaint in the United States District Court, Eastern District of New York, seeking to vacate the award. (E.D.N.Y.

1:23-civ-2219 (FB) (RML), Docket No. 1)[4] The Court issued a Memorandum and Order on June 30, 2023 confirming the Arbitrator's determination. (A-986-899).

**Procedural History**

On September 17, 2019, the Funds commenced this action by filing a Complaint in the United States District Court, Eastern District of New York, captioned *Demos P. Demopoulos, et al. v. United Metro Energy Corp., et al*, Case No. 1:19-cv-05289-FB-RML. (A-30-43; A-44-57). On April 10, 2023, three and a half years after their initial Complaint, Plaintiffs filed a Second Amended Complaint seeking to compel Appellants to provide their books and records for an audit for the period March 1, 2013 through December 31, 2018 and for the payment of any unpaid and delinquent contributions found owing as a result of such audit. (A-68-84).

The parties filed cross motions for Summary Judgment, and the District Court rendered its decision on the motions on May 23, 2024. (A-85-86; A-990-991; SPA-1-17). The District Court denied Appellants' Motion, granted the Funds' Motion, and ordered Appellants to submit to an audit for the March 1, 2013 through December 31, 2018 time period. (SPA-1-17). On June 21, 2024, Defendants initiated their appeal of the District Court's decision and order.[5] (A-1603).

---

[4] *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleadings in other lawsuits as a public record).

[5] On July 19, 2024, Appellants filed a Letter Motion to Stay the Injunction pending Second Circuit appeal. (A-1604-1606). During a conference on September 13, 2024 before Judge Block, the matter was referred to Magistrate Judge Robert Levy to determine the appropriate scope of any audit to be held during the pending appeal.

## SUMMARY OF ARGUMENT

The Funds commenced this "war of attrition" against Appellants in 2019. The dispute is centered on Appellants' alleged obligations under a series of multiemployer collective bargaining agreements ("CBAs") involving fuel and heating oil delivery drivers (e.g., the "Master Contracts.")[6]

It is undisputed that Appellants were never signatory to the Master Contracts. It is similarly undisputed that Appellants voluntarily recognized Local Union No. 533 of the International Brotherhood of Teamsters (the "Union") as the representative of a bargaining unit comprised of *all* drivers, and that under the resulting CBA between Appellants and the Union (the 2013-2017 Bulk Contract) Appellants were *not* obligated to contribute to the Funds. Further, although Appellants voluntarily made contributions to the Funds for a limited group of employees (the three 2013 Specified Employees) for a limited duration (prior to their retirement, termination or promotion)[7], the remainder of Appellants' workforce were compensated under the 2013-2017 Bulk Contract. Indeed, during this limited period, Appellants compensated only one (out of approximately fifty) drivers under the Master Contracts. The Funds' auditors, charged with auditing employer compliance

---

[6] As explained below, at issue are the Master Contracts in effect between December 16, 2010 and December 15, 2013 (the "2010-2013 Master Contract") and December 16, 2013 and December 16, 2016 (the "2013-2016 Master Contract.")

[7] The reasons for this (primarily historical) are detailed below.

with contribution obligations under the respective CBAs, consistently concluded that Appellants were not required to make contributions other than for the three specified employees. Further, the Union repeatedly asked, and the Appellants continuously and vehemently refused, to adopt the Master Contracts for all drivers. Plaintiff Demopoulos' deposition testimony confirms Appellants' ongoing resistance to covering any drivers under the Master Contracts. During the negotiations for the renewal of the 2013-2017 Bulk Contract (when the group of the three 2013 Specified Employees had been depleted for two-plus years), the Union again proposed and Appellants first agreed, to begin having an obligation to the Funds for certain (not all) drivers. This agreement was memorialized in the 2017 MOA which stated expressly that "[t]he Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master Contract as of March 1, 2017 expiring December 15, 2019 which shall *initially* cover five (5) drivers performing retail delivery work who shall be chosen by seniority from the *current bulk seniority list*." (emphasis added).

Notwithstanding the foregoing, the District Court held that the Funds established as a matter of law that Appellants had adopted the 2010-2013 and 2013-2016 Master Contracts through their conduct. As a result, the District Court further concluded that Appellants must contribute to the Funds for *all drivers* doing work covered under the Master Contracts. The District Court clearly erred in this regard.

14

The determination of whether an employer is bound by an unsigned CBA depends on the specific facts of each case, and courts "should examine the surrounding circumstances and the conduct of the parties to ascertain the parties' intent."[8] Here, the District Court failed properly to consider the rampant inconsistencies between Appellants' actions and the universe of obligations stated under the Master Contracts, Appellants' continuous refusal to adopt the Master Contracts for all drivers or otherwise expand their obligations thereunder, and the Funds' actions further evidencing their unequivocal understanding that contributions were only required for the three 2013 Specified Employees. It is clear from Appellants' conduct that they did *not* intend to be bound by the 2010-2013 and 2013-2016 Master Contracts for covered work performed by *all* drivers. It is equally clear that both the Funds and the Union understood that Appellants' were not so bound. Accordingly, there was never a meeting of the minds between the bargaining parties (the Union and the Appellants) with respect to the adoption of the 2010-2013 and 2013-2016 Master Contracts for all drivers. The District Court's finding that the Appellants had adopted the Master Contracts by conduct constituted reversible error.

Further, the District Court failed to consider the impact of the language chosen by the parties in the 2017 MOA. Under the negotiated and ultimately agreed-

---

[8] *Steelmasters, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO*, No. 05-cv-259 (MDG), 2008 U.S. Dist. LEXIS 7687, at *7 (E.D.N.Y. Feb. 1, 2008).

upon language, the parties chose to use the word "*initially*" to describe Appellants' obligations to the Funds. When viewed in this context, the District Court's finding that Appellants had adopted the Master Contracts for all drivers strains logic.

Additionally, assuming *arguendo* that the Appellants had adopted the Master Contracts by conduct, the injunctive relief ordered by the District Court was fatally flawed. It is axiomatic that the provisions of the Employee Retirement Income Security Act ("ERISA") do not require an employer to submit to an audit requested by multiemployer benefit funds. Under Supreme Court precedent, any right that the Funds have to audit Appellants' books and records must therefore arise under contract. Under the plain language of the Master Contracts and the Funds' underlying Trust Agreements, however, Appellants are outside the scope of the trustees' audit authority. Although each of the Funds' Trust Agreements impose audit obligations on "Employers," each defines "Employer" as an employer who has signed or duly executed a Collective Bargaining Agreement ("CBA") requiring contributions. It is undisputed, however, that Appellants never signed or duly executed such a CBA. Accordingly, they are not "Employers" as defined in the Trust Agreements. As the District Court correctly acknowledged, under Second Circuit law an audit can be "no more extensive than the scope of the trustees' authority."[9]

---

[9] *New York State Teamsters Conf. Pension & Ret. Fund v. Boening Bros.*, 92 F.3d 127, 134 (2d Cir. 1996.)

Here, where Appellants neither signed nor duly executed either of the Master Contracts at issue, Appellants were *not "Employers"* as defined in the Trust Agreements. The relevant audit obligations under the Trust Agreements, however, are limited in application to *"Employers;"* they therefore cannot be imposed on Appellants. The audit ordered by the District Court clearly exceeded the scope of the Trustees' authority under the express language of the Funds' governing instruments and was therefore unlawful.

By reason of the foregoing, the District Court's orders granting the Funds' Motion for Summary Judgment, denying Appellants' Motion for Summary Judgment, and ordering that Appellants submit to an audit by the Funds, must be reversed.

## LEGAL ARGUMENT

## I. <u>STANDARD OF REVIEW.</u>

This Court reviews the District Court's decision to grant summary judgment *de novo* and draws all permissible factual inferences in favor of the party against whom summary judgment is sought. *Garcia v. Heath*, 74 F.4th 44, 47-48 (2d Cir. 2023). The Second Circuit can only affirm the District Court's decision when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gittens-Bridges v. City of New York*, No. 22-810, 2023 U.S. App. LEXIS 33872, at *2 (2d Cir. 2023). It is well-established that the

Funds bear the burden of proving that Appellants are bound by the 2010-2013 and 2013-2016 Master Contracts. *See Empire State Carpenters Welfare v. Conway Constr. of Ithaca, Inc.*, No. 07-cv-2259, 2018 U.S. Dist. LEXIS 57609, at *7 (E.D.N.Y. 2018.)

## II.   BY OVERLOOKING EVIDENCE SHOWING THAT APPELLANTS' CONDUCT WAS INCONSISTENT WITH THE MASTER CONTRACTS, THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS' ADOPTED THE MASTER CONTRACTS FOR ALL DRIVERS BY THEIR CONDUCT.

When interpreting a collective bargaining agreement, "traditional rules of contract interpretation apply as long as they are consistent with federal labor policies."[10] *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). To establish an enforceable agreement under these principles, the Funds "must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. . . . That meeting of the minds must include agreement on all essential terms. . . ." *Empire State Carpenters*, 2018 U.S. Dist. LEXIS 5760, at *7 (quoting *Stapleton v. Barnett Crane Design & Engineering*, 725 Fed. Appx. 28, 31 (2d Cir. 2018)).

It is undisputed that Appellants never duly executed (either directly or as a member of the Association) the 2010-2013 Master Contract or the 2013-2016

---

[10] The present record is bereft of any suggestion that the application of these "traditional rules of contract interpretation" would run afoul of "federal labor policies."

Master Contract. Appellants acknowledge that this alone does not render the Funds' claims invalid, and that under *certain circumstances* conduct alone may manifest an intent to adopt, or agree to, an unsigned CBA. *Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir. 1999). This "adoption by conduct" doctrine is consistent with the traditional contract principle that a "contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct." *Hongxia Wang v. Enlander*, No. 17-cv-4932 (LGS), 2018 U.S. Dist. LEXIS 37910, at *17 (S.D.N.Y. Mar. 6, 2018) (internal citations omitted). To assess whether the requisite meeting of the minds has occurred, courts are instructed to "examine surrounding circumstances and the conduct of the parties to ascertain their intent with regard to a CBA." *Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-cv-3940 (DLI) (RML), 2015 U.S. Dist. LEXIS 39855 * 18 (E.D.N.Y. Mar. 27, 2015.) An examination of the conduct of both the Funds and the Appellants unequivocally evidences that neither party intended nor understood that Appellants were (as the District Court held) obligated to "contribute to the Funds for drivers performing covered work under the 2010-2013 and 2013-2016 Master Contracts." (SPA-15). As proven herein, this conclusion was erroneous.

The District Court based its finding that Appellants had adopted the 2010-2013 and 2013-2016 Master Contracts through their conduct on Appellants' submission of remittance reports and payment of contributions to the Funds, payment of wages and union dues, submission to audits by the Funds and payments to the Funds pursuant to the audit findings. (SPA-8). While Appellants do not contest this, such actions were limited solely to the three 2013 Specified Employees.[11] The balance of Appellants' drivers (approximately 50)[12], however, were covered under a CBA (the 2013-2017 Bulk Contract) that did not require Appellants to contribute to the Funds. The District Court's failure to consider the terms and limitations of the bargaining parties' written agreement mandates reversal.

It is well-established that when an employer's conduct is inconsistent with the collective bargaining agreements sought to be enforced against them, the employer did not intend to be bound by these agreements. See, e.g., *AGL Indus. v. Iron Workers Local 40,* No. 14-cv-03618 (FB) (RLM), 2014 U.S. Dist. LEXIS

---

[11] Apollo I compensated three employees: Paul Senatore ("Senatore"), John Spaight ("Spaight"), and Thomas Galasso ("Galasso") pursuant to the terms of the 2010-2013 Master Contract, including making contributions to the Funds on their behalf. (A-280:12-283:12; A-320-329 ¶ 16; A-410:5-411:6; A-413:23-414:6, A-417:17-24). After acquiring the assets of Apollo I, Appellants continued to employ Senatore, Spaight, and Galasso. (A-320-329 ¶ 18; A-410:20-411:17; A-415:23-416:18). Appellants continued the "historic" arrangement with the Union to pay only Senatore, Spaight, and Galasso (and none of Appellants' other union employees) according to the terms of the 2010-2013 Master Contract until Senatore, Spaight, and Galasso were promoted, terminated, or retired. (A-306:13-22; A-410:20-411:17; A-415:23-416:24; A-926-928; A-940-941; A-958-959; A-963-964; A-972-973).

[12] A-320-329 ¶ 11; A-406:10-13, A-410:20-415:21.

176833, at *5 (E.D.N.Y. Dec. 22, 2014); *Panek v. Cimato Bros. Constr., Inc.*, No. 02-cv-333(A), 2007 U.S. Dist. LEXIS 76359, at *4-5 (W.D.N.Y. Oct. 15, 2007).

The District Court concluded that complying with the Funds' audits, submitting remittance forms, and making contributions to the Funds on behalf of the three 2013 Specified Employees between 2013 and 2015 somehow manifested Appellants' intent to be bound by the 2010-2013 and 2013-2016 Master Contracts for all of its drivers. As noted, however, the drivers were already covered by the 2013-2017 Bulk Contract. This absurd result stemmed, in part, from the Court's failure to "view the employer's conduct as a whole." *Panek*, 2007 U.S. Dist. LEXIS 76359, at *9. When so viewed, the totality of the evidence overwhelmingly confirms (in the words of Plaintiff Demopoulos) that Appellants "were trying to get away from the Master Contract" rather than adopt it. (A-175).

The Court in *Panek* found the requisite intent to be bound by the collective bargaining agreement lacking because of conduct that was inconsistent with or contrary to the requirements of the CBA; these included the payment of different wages to laborers who performed the same work and the payment of contributions required under the CBA for some but not all of its employees. *Id.* at *11-12. Similarly, in *AGL Indus.* the court held that where (as here) the employer refused to sign an earlier collective bargaining agreement with the union and paid employees doing the same work different wages and fringe benefits, the funds had

failed to establish that the employer intended to be bound by the collective bargaining agreement. *AGL Indus.*, 2014 U.S. Dist. LEXIS 176833, at \*3-4. Courts outside of the Second Circuit have also so held. *See also Firesheets v. A.G. Bldg. Specialists*, 134 F.3d 729, 731-732 (5th Cir. 1998) (finding defendant's conduct to be inconsistent with the collective bargaining agreement and that defendant had therefore not adopted the agreement by its conduct because it hired nonunion employees, set its own wages, and only made contributions for certain employees); *Koller Plumbing Co. v. Sheet Metal Workers' Int'l Assoc., Local Union No. 162*, No. CV F-89-716 (EDP), 1990 U.S. Dist. LEXIS 18706, at \*8-9 (E.D. Cal. Aug. 14, 1990) (making trust fund contributions on behalf of a single employee does not establish adoption by conduct); *Alaska Trowel Trades Pension Trust v. Rady Concrete Constr., LLC*, No. 3:15-cv-00061 (SLG), 2016 U.S. Dist. LEXIS 151853, at \*16 (D. Alaska Nov. 2, 2016) (defendant did not adopt CBA by conduct because their actions, such as making contributions for and otherwise applying certain provisions to select employees, were inconsistent with an intent to be bound by the agreement.)

Here, evidence on the record shows that Appellants only submitted remittance reports and made contributions to the Funds on behalf of a select number of specified employees (i.e., the three 2013 Specified Employees and the five 2017 MOA Specified Employees.) (A-184; A-228:21-229:3; A-303:11-17; A-306:13-22;

A-320-329 ¶ 27; A-926-928; A-940-941; A-958-959; A-963-964; A-972-973). Specifically, Appellants made contributions on behalf of a single employee from May 2013 through May 2015, did not make any contributions during the period June 2015 through October 2017, and thereafter made contributions on behalf of the 2017 MOA Specified Employees as that group was depleted by attrition. (A-554-596; A-597-645; A-646-674; A-675-680; A-681-687; A-701-710; A-711-750; A-751-789).

During the duration of the 2013-2017 Bulk Contract, all of Appellants' drivers were covered under the 2013-2017 Bulk Contract. (A-320-329 ¶ 32). Notably, the 2013-2017 Bulk Contract to which the Appellants were signatory does not require Appellants to make contributions to the Funds. Prior to entering into the 2017 MOA, Appellants voluntarily paid higher wages and made fringe benefit contributions, provided for under the Master Contracts, on behalf of the 2013 Specified Employees. (A-306:13-22, A-410:20-411:17, A-415:23-416:18, A-926-928; A-940-941; A-958-959; A-963-964; A-972-973). However, Appellants' act of voluntarily paying more than required by the 2013-2017 Bulk Contract merely evidences Appellants' desire to retain specified senior employees that had previously been compensated on that basis. It does not evidence their intent to adopt the Master Contracts for all drivers.

A review of the conduct of the Union and the Funds similarly prove that their understanding (contrary to the District Court's conclusion) was that

Appellants had not adopted the 2010-2013 and 2013-2016 Master Contracts for the benefit of all drivers. Demopoulos (who is both an executive officer of the Union and a trustee of the Funds) repeatedly testified to that effect:

> Q.    So the only ones that were covered by the Master Agreement between 2013 and 2017 were Spade, Galasso and Senator, nobody else, right?
>
> A.    Right.[13]
>
> *     *     *
>
> Q.    All right. So it is a fact that the company did not adopt the Master Contract with respect to dispatchers, servicemen, terminal maintenance employees or drivers other than Senator, correct?
>
> A.    Yes.[14]
>
> *     *     *
>
> Q.    I'm only talking about this employer. At no time under this employer were the dispatchers, servicemen, terminal maintenance employees or drivers covered by this contract with the sole exceptions of Paul Senator, Galasso, and Spade. Is that correct?

---

[13] A-184.
[14] A-178.

A.    Yes.[15]

\*       \*       \*

Further, the Funds' auditors consistently found that Appellants' obligation to make contributions to the Funds were limited to the 2013 Specified Employees and the 2017 MOA Specified Employees. In addition, the Union negotiated the 2013-2017 Bulk Contract with Appellants which, by its terms, covers all of Appellants' drivers. When said agreement expired and was being renegotiated, the Union "wanted to have one employee covered under the master contract for purposes of the Teamster union politics." (A-299:11-15). Because Appellants "were reluctant to put anybody on," the Union "was glad to get five on [referring to the five 2017 MOA Specified Employees] at that time." (A-183). In light of this evidence, it strains logic to assert that the Union and the Funds understood all of Appellants' drivers to be covered under the 2010-2013 and 2013-2016 Master Contracts. To the contrary, it is undisputed on the record that Appellants regularly rejected the Union's requests to expand the universe of drivers covered by the Master Contracts beyond the 2013 Specified Employees.

Similarly, the 2017 MOA evidences that between March 2015 (when Senatore, the last remaining 2013 Specified Employee, retired) and November 1,

---

[15] A-178.

25

2017: (i) Appellants were not signatory to or otherwise obligated under the Master Contracts; and (ii) Appellants' obligations flowed exclusively from the Bulk Contract. During the negotiations for the renewal of the 2013-2017 Bulk Contract, Appellants first agreed to *begin* having a written agreement requiring them to make contributions to the Funds for certain drivers, not all drivers. As negotiated, the 2017 MOA stated in part that "[t]he Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master Contract as of March 1, 2017 expiring December 15, 2019 which shall *initially* cover five (5) drivers performing retail delivery work who shall be chosen by seniority from the current bulk seniority list." (emphasis added). (A-340-342).

The bargaining parties (Appellants and the Union) chose the word "initially" to describe the Appellants' limited obligations under the 2017 MOA and the Master Contracts. As defined by the Merriam-Webster dictionary, "initial" means, "of or relating to the beginning." (*Initial*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/initial (last visited Sept. 20, 2024)) Importantly and informatively, the bargaining parties chose "initially" over "continue" or "resume." The language used by the Union and Appellants evidence their mutual understanding and intent that prior to the 2017 MOA, Appellants' obligations were exclusively derived from the Bulk Contract.

The 2017 MOA further provides that the initial employees covered by the Funds shall be chosen from the "bulk seniority list." The only reasonable explanation for the reference to the "bulk seniority list" is that all bargaining unit members were already covered by the terms of the 2013-2017 Bulk Contract. Appellants only maintained one seniority list; a bulk seniority list that covered all of Appellants' drivers.[16] There was no "master contract seniority list" because Appellants were only obligated under the Bulk Contracts, and never (other than with respect to the 2013 Specified Employees) under the Master Contracts. The Appellants' limited obligation to the Funds began[17], as explained by the bargaining parties use of the word "initially," on November 1, 2017.

The District Court all but ignored the 2017 MOA. Curiously, the District Court attempted to interpret the parties' conduct, rather than their contract. There is no need to interpret a contract through conduct when it can be interpreted by its terms. By way of the 2017 MOA, the bargaining parties expressly memorialized their mutual intent and understanding as it relates to the Master Contracts and the Funds. The Appellants respectfully request that this Court give meaning to the plain, specific language of the 2017 MOA. Under this language of

---

[16] A-165.
[17] As noted, the Appellants made no contributions to the Funds following the depletion of the 2013 Specified Employees occasioned by Senatore's retirement in May 2015.

the 2017 MOA, Appellants' obligations to the Funds began, if ever, on or after March 1, 2017.

Further, courts have found that evidence of an employer's clear refusal to sign the collective bargaining agreements demonstrates the absence of the mutuality of agreement needed for contract formation. *See Brown v. Dominic Prisco Transp., Inc.,* No. cv-95-1121 (ADS), 1997 U.S. Dist. LEXIS 23709, at *23-24 (E.D.N.Y. Aug. 16, 1997); *see also Empire State Carpenters*, 2018 U.S. Dist. LEXIS 57609, at *9-10 (finding that defendant did not intend to and did not adopt the collective bargaining agreement by conduct because the defendant made it clear that he "could not sign the agreement" and refused to do so on three occasions).

Demopoulos, a trustee of the Funds, testified that after Senatore (the last remaining 2013 Specified Employee) retired in 2015, Appellants consistently resisted repeated attempts to expand Appellants' obligations under the Master Contracts:

A. We were looking to just get -- get it repopulated, to get it started.

Q. As many people as you can?

A. All that time we were getting no, no, no, no.

Q What do you mean? You were asking the company to put them in the Master Contract and the company said saying no, no, no? Is that what I'm to understand?

> A. From the day that Senator left.

(A-188).

In his words, they were "resistant to put anyone on the Master Contract."[18] In light of Appellants' continued refusals in this regard, "it would be ridiculous to assert there was an agreement between the parties" to cover all drivers under the Master Contracts. *Moglia v. Geoghegan*, 403 F.2d 110, 118 (2d. Cir 1968) (finding no agreement when the employer "did not appear willing to accept [the terms of the] collective bargaining agreement" at any time). But the District Court did just that. Contrary to the District Court's holding, Appellants ongoing resistance and refusal to include drivers under the Master Contracts proves that the requisite manifestation of intent to adopt the Master Contracts for all drivers was wholly lacking. Indeed, the Union's requests that Appellants sign the Master Contract or otherwise expand their obligations thereunder, and Appellants' refusals, "could only support an inference that neither party believed a labor agreement was in effect between them." *International Brotherhood of Electrical Workers, Local 532 v. Brinks Construction*, 825 F.2d 207, 215 (9th Cir. 1987).

---

[18] A-183.

**III. EVEN IF APPELLANTS HAD ADOPTED THE MASTER CONTRACTS BY THEIR CONDUCT (WHICH THEY DID NOT), THE DISTRICT COURT ERRED IN ORDERING APPELLANTS TO SUBMIT TO AN AUDIT THAT EXCEEDS THE SCOPE OF THE FUNDS' TRUSTEES AUDIT AUTHORITY.**

As demonstrated, the District Court's holding that Appellants had "adopted the 2010-2013 and 2013-2016 Master Contracts with their conduct" (SPA-8) was erroneous and must be vacated. However, even if Appellants had adopted the Master Contracts for all drivers by their conduct (they have not), the District Court further erred in ordering Appellants to "permit and cooperate in the conduct of an audit of its records." (SPA-15).

The Funds' right to conduct the requested audit is not statutory. As the Supreme Court of the United States has noted, "the right to conduct an audit of the kind involved in this case must be granted by contract; it is not conferred by ERISA itself." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport*, 472 U.S. 559, 583 (1985) (Stevens, J., concurring in relevant part). Further, under *Central Transport,* where the relevant agreements preclude or otherwise limit the right to audit, trustees are bound by their "common law and ERISA fiduciary duties to abide 'by the terms of the trust.'" *Boening*, 92 F.3d at132, quoting Restatement (Trusts), § 164(a); *see also* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (trustees must discharge their duties "in accordance with the documents and instruments governing the plan.")

Consistent with these principles and as the District Court correctly acknowledged, the audit must be "no more extensive than the scope of the trustees' authority." (SPA-15); *see also Boening*, 92 F.3d at 134 (trustees are "limited in their discretion by the common law concept that a trustee may only act within the scope of his or her authority") (quoting *Central Transport*, 472 U.S. at 583). By ordering Appellants to submit to an audit that exceeds the scope of the Funds' trustees' authority under the Trust Agreements, the District Court violated this axiom.

As noted above, courts generally interpret collective bargaining agreements by using traditional rules of contract interpretation. "When provisions in the agreement are unambiguous, they must be given effect as written." *United Techs. Corp.*, 230 F.3d at 576. Contract language is considered "unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). Similarly, trust agreements are also interpreted according to their plain language. *Aramony v. United Way of Am.*, 254 F.3d 403, 412 (2d Cir. 2001) ("we interpret and enforce unambiguous language in an ERISA plan according to its plain meaning'") (internal citations and quotations omitted).

Here, each of the Trust Agreements clearly and unambiguously limits the scope of the trustees' authority to conduct audits to entities that have **signed** a CBA with the Union and are **signatory** to the Trust Agreements. It is undisputed

31

that Appellants did not sign a CBA obligating it to make Fund contributions during the period at issue. It is similarly undisputed that Appellants are not signatory to the Trust Agreements. The District Court ignored the plain language of the Trust Agreements when it ordered Appellants to submit to an audit that exceeds the scope of the Funds' audit authority. As a result, the audit ordered by the District Court is clearly in error.

The definition of "Employer" is limited to companies who signed or executed a CBA with the Union by the clear and unambiguous terms of each of the Trust Agreements. The Benefits Trust Fund Agreement provides the following definition:

> The term 'Employer' shall mean each employer who has duly executed a Collective Bargaining Agreement and who is a signatory to this Agreement and Declaration of Trust, or is otherwise legally bound to such Agreements by virtue of having executed an authorization in favor of the New York Oil Heating Association Inc. or Oil Heat Institute of the Bronx, Inc…

(A-819-842, Art. 1 § 1). Similarly, the Deferred Compensation Fund Trust Agreement defines an Employer as:

> Each employer who has duly executed a Collective Bargaining Agreement or is legally bound to such Agreement by virtue of having executed an authorization in favor of the Association named in Article III, Section 7(b) and who is a signatory to this Agreement and Declaration of Trust…

(A-843-861, Art. 1 § 1). The language of the Pension Fund Trust Agreement is also similarly clear:

32

> The term "Employer" shall mean each employer who has duly executed a Collective Bargaining Agreement and who is a signatory to this agreement …

(A-862-891, Art. 1 § 1).

Notably, each of the Trust Agreements limits the scope of the trustees' right to conduct audits to **Employers**. (*See* Benefits Trust Fund Agreement, Article V, Section 1 ("The Trustees may at any time audit the pertinent records of any *Employer* in connection with the above.") (emphasis added) (A-819-842, Art V §1); Deferred Compensation Fund Trust Agreement, Article V, Section 1 (same) (A-843-861, Art V §1); Pension Fund Trust Agreement, Article V, Section 3 ("Each **Employer** shall promptly furnish to the Trustees on demand such payroll records and data with respect to individual employees as the Trustees may reasonably require in connection with the administration of the Funds.") (emphasis added) (A-862-891, Art V §3).

It is beyond dispute that Appellants are not an "Employer," as that term is defined for purposes of each of the Trust Agreements, because Appellants neither directly or indirectly (via the Association) executed a Collective Bargaining Agreement nor were they signatory to any of the Trust Agreements. The audit ordered by the District Court therefore exceeds the scope of the Trustees' authority. Accordingly, the District Court erred in ordering an audit of Appellants' books and records.

The audit ordered by the District Court also exceeds the scope of Appellants' obligations (if any) under the 2010-2013 and 2013-2016 Master Contracts. Each provides that "if the Union enters into any Agreement (herein called "a more favorable Agreement") directly or indirectly, oral or in writing, which permits the employment of its members under terms and conditions less favorable to said members than those herein provided, the Employer shall have the right to demand and receive the more favorable contract." (A-432; A-456; A-1369; A-1393). The District Court held that Appellants had adopted each of these CBAs for all drivers. (SPA-8). In this regard, the District Court ignored that Appellants had entered into a CBA with the Union (e.g., the 2013-2017 Bulk Contract) that by its express terms set forth the rates of pay and other conditions of employment for all of Appellants' drivers. *See* A-331, WHEREAS clause (expressing intent of parties to establish wages and conditions of employment for all employees covered under the agreement; *see also* A-331, Article I-COVERAGE, providing that "[t]he Employer recognizes the Union as the duly authorized representative and bargaining agent for all Drivers"); A-219-220 (Demopoulos testimony showing that by its clear terms the Bulk Contract covered all drivers without regard to whether covered under a Master Contract.)

The rates of pay for drivers under the 2010-2013 and 2013-2016 Master Contracts are higher than those provided under the 2013-2017 Bulk Contract. (A-

185). In addition to the wage differential, no contributions to the Funds were required under the 2013-2017 Bulk Contract. (A-330-339). Based on the record before the District Court, there is no question that the 2013-2017 Bulk Contract "permits the employment of" Union members "under terms and conditions less favorable" than the terms and conditions provided under the Master Contracts. The 2013-2017 Bulk Contract is therefore "a more favorable Agreement" (as that term is defined in the 2010-2013 and 2013-2016 Master Contracts) permitting Appellants to "demand and receive the more favorable contract." Under the terms of the more favorable 2013-2017 Bulk Contract, contributions to the Funds are not required. (A-330-339). As a result and as mandated by the foregoing operative terms of the CBAs, Appellants' Motion for Summary Judgment should have been granted and the Funds' Motion for Summary Judgment denied.

## <u>CONCLUSION</u>

For these reasons, the Court should reverse the District Court's May 23, 2024 Memorandum Decision and Order and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,
JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017

Dated: September 30, 2024          By:   /s/ Robert R. Perry_____
     New York, New York          Robert R. Perry
                                 David Pixley
                                 *Attorneys For Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of FRAP 32(a)(7)(B) and Local Rule 32.1(a)(4) because it contains 7,803 words, excluding the parts of the document exempted by FRAP 32(f).

This Brief complies with the typeface requirements of FRAP 32(a)(5)(A) and the type-style requirements of FRAP 32(a)(6) because it is in 14-point Times New Roman proportional font.

/s/ Robert R. Perry
Robert R. Perry

Dated:　　September 30, 2024

36

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Memorandum and Order of the Senior United States
   District Judge Frederic Block, dated
      May 23, 2024 ........................................................   SPA-1

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
DEMOS P. DEMOPOULOS, VICTOR
CASTELLANO, VINCENT THEURER
and JEFF HAMMOND, as Trustees and
Fiduciaries of the LOCAL 553
PENSION FUND; and as Trustees and
Fiduciaries of the LOCAL 553
DEFERRED COMPENSATION FUND;
and as Trustees and Fiduciaries of the
LOCAL 553 BENEFITS FUND,

                    Plaintiffs,

    -against-

UNITED METRO ENERGY CORP.,
UNITED APOLLO PETROLEUM
TRANSPORTATION CORP., and
UNITED APOLLO TRANSPORTATION
CORP.,

                    Defendants.
-------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 19-cv-5289 (FB) (RML)

*Appearances:*
*For the Plaintiffs:*
WILLIAM ANSPACH
LEO GERTNER
Friedman & Anspach
1500 Broadway, Suite 2300
New York, NY 11036

*For the Defendants:*
ANA GETIASHVILI
JONATHAN D. FARRELL
MARK A. RADI
Meltzer, Lippe, Goldestein &
Breistone, LLP
190 Wllis Avenue
Mineola, NY 11501

**BLOCK, Senior District Judge:**

    In this Employee Retirement Income Security Act ("ERISA") case,

Plaintiffs, the Trustees and Fiduciaries of the Local 553 Pension Fund, the Local

SPA-2

553 Deferred Compensation Fund, and the Local 553 Benefits Fund (collectively, "Plaintiffs" or the "Funds") seek an audit of the records of Defendants United Metro Energy Corp. ("UMEC"), United Apollo Petroleum Transportation Corp. ("UAP"), and United Apollo Transportation Corp. ("UAT") to determine whether Defendants owe delinquent contributions on behalf of covered employees under a multiemployer collective bargaining agreement ("CBA"). Both parties move for summary judgment. For the following reasons, Plaintiffs' motion for an audit is granted, and Defendants' motion is denied.

## I.    BACKGROUND

### A. Legal Standards

The following facts are taken from the pleadings, the parties' Rule 56.1 statements, and the supporting documentation. The facts are undisputed unless otherwise noted. A moving party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When both parties move for summary judgment, the Court examines each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).

## B. The Parties, Union, and Master Contract

This case is the latest salvo in a long war of attrition between the Funds,

Local 553, International Brotherhood of Teamsters, ("the Union"), and Defendants

over Defendants' alleged obligations under a multiemployer CBA involving fuel

and heating-oil delivery drivers (the "Master Contract.")[1]  The Funds are employee

benefit plans established pursuant to CBAs between the Union and employers that

operate pursuant to Trust Agreements and provide pension, deferred compensation,

and other benefits.

This dispute largely turns on whether Defendants are subject to Funds

obligations under the Master Contract.  The Union has two relevant multiemployer

CBAs: (1) the Master Contract, covering drivers performing residential or retail

---

[1] This Court has already seen substantially the same contractual dispute between the Union, the Plaintiffs, and the Defendants in three dockets.  First, UMEC moved to stay the Union's requested arbitration as to interpretation of the 2017 Memorandum of Agreement.  *See, e.g.*, *United Metro Energy Corp. v. Loc. 553, I.B.T.*, No. 1:22-CV-00151-FB-RLM, 2022 WL 2390993, at *1 (E.D.N.Y. July 1, 2022) (enforcing arbitration clause as to whether drivers are covered by the Bulk Contract or Master Contract).  Second, the Union moved to vacate the ensuing arbitration award.  *See Loc. 553, I.B.T v. United Metro Energy Corp et al*, No. 23-cv-2219 (FB)(RML) (E.D.N.Y. June 30, 2023) (confirming arbitration award).  Third, in this ERISA case, the Court has already written two opinions, first granting Plaintiffs' motion to amend their complaint, and then denying Defendants' motion for reconsideration.  *See Demopoulos v. United Metro Energy Corp.*, No. 119CV05289FBRLM, 2022 WL 2390986, at *1 (E.D.N.Y. July 1, 2022), *reconsideration denied*, No. 19CV5289FBRLM, 2023 WL 2683012 (E.D.N.Y. Mar. 29, 2023).

3

SPA-4

work, i.e., smaller deliveries with stops at multiple locations, and (2) the "Bulk Contract," covering drivers performing the delivery of "bulk" work, i.e., large or full fuel loads to one or two stops.  The Master Contract is more favorable for drivers because it provides higher pay rates and, unlike the Bulk Contract, requires employers to make Funds contributions for covered work.  The Master Contract incorporates the Trust Agreement and provides a right to audit "whenever such examination is deemed necessary or advisable by the Trustees."

In 2013, Defendant UMEC purchased the assets of a company called Metro, which was in bankruptcy.  Metro was composed of two companies — Apollo Petroleum Transportation, Inc. ("Apollo 1") and Apollo Petroleum Transportation, LLC ("Apollo 2") — and had employed drivers covered by both the Master and Bulk Contracts.  Mirroring this structure, UMEC created UAT and UAP.[2]

After the asset purchase, Defendants continued to employ three employees formerly employed by Apollo 1 and about fifty drivers employed by Apollo 2.  While Defendants ultimately executed the 2013-17 and 2017-21 Bulk Contracts, the parties dispute whether, and to what extent, Defendants adopted the Master

---

[2] The parties contest the relationship between Defendants because, Plaintiffs argue, they are alter egos.  For the sake of brevity, the Court will refer to "Defendants" in the following discussion while noting that Defendants dispute which entity was involved in what.

4

Contract with their conduct.  Although Defendants never signed the Master Contract, it is uncontested that Defendants continued to provide the three Apollo 1 employees previously under the Master Contract — John Spaight ("Spaight"), Thomas Galasso ("Galasso") and Paul Senatore ("Senatore") — with the Master Contract's pay and benefits and submitted Funds contributions and remittance reports on their behalf.  These contributions and payments continued until Spaight moved to management in 2013, and Galasso and Senatore retired in June 2013 and May 2015, respectively.  For around two years, Defendants made no Funds contributions, although Plaintiffs intimate that Defendants should have been making contributions because drivers were performing covered work under the Master Contract.   By 2017, Plaintiffs estimate there were at least five drivers performing work covered by the Master Contract.

In July 2017, UMEC and the Union signed a Memorandum of Agreement ("MOA") extending the Bulk Contract and stating in Paragraph 11:

> The Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master Contract as of March 1, 2017, expiring December 15, 2019, which shall initially cover five (5) Drivers performing retail delivery work who shall be chosen be seniority from the current bulk seniority list.

After signing the MOA, Defendants submitted remittance reports and paid Funds contributions for the initial five drivers until January 2020.

5

### C. Litigation History

Plaintiffs commenced this litigation in 2019, seeking an audit and alleging that when the Funds' auditors sought to conduct a payroll compliance audit in July 2019, Defendants refused to produce necessary documents.  Concerned that Defendants had not fully reported work covered by the Master Contract, the auditors determined that a full audit from March 1, 2013, through December 31, 2018, was necessary.  Defendants refused to produce the relevant records.

The MOA also gave rise to separate litigation, involving the Union, rather than the Funds, and UMEC.  After two of the initial five retail delivery drivers covered by the Master Contract retired, the Union requested that UMEC apply the Master Contract to the next two most senior retail delivery drivers.  When UMEC refused, the Union filed a grievance in 2020. UMEC refused to arbitrate, instead initiating litigation before this Court to enjoin arbitration.  This Court granted the Union's Rule 12(b)(6) motion to dismiss, finding that the matter must be submitted to arbitration pursuant to agreements between the Union and UMEC.  *See United Metro Energy Corp. v. Loc. 553, I.B.T.*, No. 1:22-CV-00151-FB-RLM, 2022 WL 2390993 (E.D.N.Y. July 1, 2022).

In February 2023, Arbitrator Howard C. Edelman issued an award

6

(the "Arbitration Award") that found that this disputed language required UMEC only to pay the Master Contract rates, as an initial matter, to the five drivers who make retail deliveries and denied the Union's grievance.

The Union moved to vacate the Award before this Court. However, on June 30, 2023, under a deferential standard of review, the Court confirmed the Award's determination that the MOA "did not require [UMEC] to pay all retail delivery drivers in accordance with the rates set out in the Master Contract, only that five of them who did engage in retail work receive higher pay." *See Loc. 553, I.B.T v United Metro Energy Corp. et al*, Docket No. 23-cv-2219 (FB) (RML) (E.D.N.Y. June 30, 2023).

## II. DISCUSSION

### A. Whether Defendants Adopted the Master Contracts

The primary issue is whether, and to what extent, Defendants adopted the Master Contracts, which require Funds contributions and, by incorporating the Trust Agreements, provide audit rights. *See Trustees of the Sheet Metal Workers' Nat. Pension Fund v. Steel & Duct Fabrication, Inc.*, 124 F. Supp. 3d 187, 196 (E.D.N.Y. 2015) (trustees have audit rights under contractual language and law of employee benefit plans) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Central Transp.*, Inc., 472 U.S. 559, 569, 571–73, 581 (1985)).

SPA-8

### 1.  2010-13 and 2013-16 Master Contracts

While both parties agree that, before the 2017 MOA, Defendants never signed the Master Contracts or another document, they disagree as to whether Defendants adopted the Master Contracts through their conduct, which would require Defendants to make Funds contributions for covered work.  The Court concludes that Defendants adopted the 2010-13 and 2013-16 Master Contracts with their conduct.[3]

A party need not sign a CBA to have an obligation to make ERISA plan obligations.  *See Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir. 1999) (61 remittance reports, employer's cooperation with the audit, payment of union wages to employees, employer's letter to the Trustees acknowledging appellant's "responsibility to the funds," are sufficient, absent contrary evidence, to establish as a matter of law employer's intent to adopt the two unsigned CBAs).  Instead, a court must examine surrounding circumstances and the conduct of the parties to ascertain the parties' intent to be bound to a CBA.  *See Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-CV-3940 DLI RML, 2015 WL 1443038, at *5 (E.D.N.Y. Mar. 27, 2015) (collecting cases).

_____

[3] During the relevant period, the Master Contracts were negotiated every three years.

Relevant indicia of a party's intent to be bound to a CBA include making Funds contributions, timely filing remittance reports, remitting union dues, submitting to an audit by the union, and paying CBA wages and benefits. *See id.*; *see also Trustees of Loc. 7 Tile Indus. Welfare Fund v. Goal Enterprises, Inc.*, No. 20-CV-1958 (KAM) (RER), 2022 WL 17820088, at *4 (E.D.N.Y. July 6, 2022).

Plaintiffs have established, as a matter of law, that Defendants adopted the 2010-13 and 2013-16 Master Contracts through their conduct. Specifically, they provide extensive evidence that: (1) Defendants submitted 31 monthly remittance reports that refer to the Trust Agreements governing the Funds; (2) Defendants paid Funds contributions at the rates specified in the Master Contracts; (3) Defendants paid the three employees the higher wages and provided the vacations and holidays specified in the Master Contract; (4) Defendants withheld union dues for the employees; and (5) Defendants submitted to audits of their books and records for 2013, 2014, 2015, and 2017, and paid any amounts found owing by the auditor. This conduct more than sufficiently manifests Defendants' intent to adopt the CBA. *See Gesualdi v. N. Star Concrete, Inc.*, No. CV144430SJFAYS, 2016 WL 7974111, at *8 (E.D.N.Y. Dec. 28, 2016), *report and recommendation adopted*, No. 14CV4430SJFAYS, 2017 WL 354188 (E.D.N.Y. Jan. 24, 2017) (numerous remittance reports, funds contributions, and submittal to audits provides

9

"ample evidence" to grant plaintiff summary judgment).

Defendants' principal explanation of their behavior is that they merely did the Union a "favor" by "informally" paying the employees under the Master Contract, which, they urge, does not amount to full adoption of the Master Contract for all covered work. But whatever Defendants' *subjective* intention, it is their *objective* conduct that binds them to the Master Contract. *See Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (in contract analysis, objective intent of parties, rather than "secret or subjective" intent, controls). And courts have generally found unpersuasive a defendant's inaction, i.e., not signing the agreement, when it seems "reasonable that [the defendant] would have made some sort of express statement that, although it had been or would be complying with the CBA in many respects, it was not adopting or assuming that agreement." *Serv. Emps. Int'l Union, Loc. 32BJ v. Coby Grand Concourse*, LLC, No. 04 CIV. 9580(CSH), 2006 WL 692000, at \*4 n.2 (S.D.N.Y. Mar. 16, 2006). Defendants cannot rely on post hoc disavowal.

Contrary to Defendants' assertion that they merely intended to cover specific drivers, rather than covered work, Defendants assumed the obligation to make Funds contributions for all covered work. *See Gesualdi*, 2016 WL 7974111, at \*9 (employer obligated to make contributions for work covered by the CBA);

10

*Trustees of the Buffalo Laborers' Pension Fund v. Accent Stripe, Inc.*, No. 01-CV-76C(SC), 2007 WL 1540267, at *6 (W.D.N.Y. May 24, 2007) (employer obligated to contribute for all employees performing covered work, regardless of union status). Defendants appear to have perfectly understood that the Bulk and Master Contracts covered different types of *work*. As UMEC President Anthony Peretta stated in his deposition: a driver performing covered residential work would "come under the master agreement"; "if we needed the drivers to make the residential deliveries, they were covered under the master contract"; and "everybody at that table that's in the industry, aside from the lawyers, knew what bulk drops meant." And from a labor relations perspective, it would make little sense if Defendants could dodge the Master Contract's obligations by having different employees perform covered retail work.

Accordingly, because Defendants adopted the 2010-13 and 2013-16 Master Contracts, Plaintiffs are entitled to an audit, and, if Defendants' employees were performing covered work, Plaintiffs are entitled to Funds contributions.

### 2. *2016-19 Master Contract*

As to the 2016-19 Master Contract, the Court finds that by signing the 2017 MOA, Defendants adopted the Master Contract's obligations only as to the five drivers initially chosen from the seniority list. Although Defendants are incorrect

11

that either collateral estoppel or res judicata applies because Plaintiffs were not a party to the Arbitration,[4] *see Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, Apprenticeship, Journeyman Retraining Educ. & Indus. Fund v. Nicholas Indus. & Constr. Servs. Inc.*, No. 18 CIV. 2098 (LLS), 2019 WL 418497, at *1 (S.D.N.Y. Jan. 18, 2019) (rejecting res judicata argument), the Court finds the Arbitration Award's reasoning persuasive.

Arbitrator Edelman concluded that UMEC did not violate the MOA because of the MOA's language. The MOA provided that the Master Contract "shall initially cover five (5) Drivers performing retail delivery work," which, Arbitrator Edelman concluded, meant that the only guarantee was that those five drivers would receive the Master Contract's higher pay. Thus, the MOA operated as a ceiling, rather than a floor. Arbitrator Edelman also reasoned that the parties were capable of crafting language covering all retail delivery work but chose not to.

Plaintiffs argue that Defendants fully adopted the Master Contract with their conduct and by signing the MOA. The critical distinction for this period, however, is that the MOA's language specifically limits the Master Contract's rates and

---

[4] For this reason, as well as the Arbitration Award's consideration of the 2017 MOA, rather than Defendants' pre-2017 conduct, the Award does not bar all of Plaintiffs claims.

12

benefits to the initial five drivers. Accordingly, the Court finds that the Defendants are bound to the Master Contract only as to the initial five drivers.

### B. Whether Defendants Are Alter Egos

The Court finds that Defendants are alter egos, which entitles Plaintiffs to seek records from all Defendants during their audit. The alter ego doctrine provides the analytical hook to bind non-signatories to a CBA when the enterprises "have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010). The doctrine has traditionally focused on "an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Truck Drivers Local Union No. 807 v. Reg'l Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991).

Plaintiffs have sufficiently shown that Defendants are alter egos. As set forth extensively in Plaintiffs' papers, Defendants shared the same business agent, had substantially identical management and supervision, engaged in substantially identical business, and used the names of the three entities interchangeably. Peretta testified that a UMEC manager assigned work to all drivers, and as this Court previously noted, UMEC Vice Chairman Nelson Happy ("Happy") appeared

13

"uninformed of the subsidiaries' relationship," could not "clearly distinguish the companies," and "could not even provide details about their ownership." *Demopoulos*, 2022 WL 2390986, at *2.

While "an intent to evade union obligations" is not a "necessary factor," it is "a germane or sufficient basis for imposing alter ego status." *UNITE HERE*, 629 F.3d at 288 (cleaned up). Here, Defendants first distinguished between the entities at a late hour in this litigation, disclaiming UMEC's contractual obligations and stating that UAT was the sole employer of the three employees under the Master Contract. Because Plaintiffs initially named only UMEC as a defendant and included UAP and UAT as aliases rather than separate defendants, UMEC appeared to be playing a "shell game" to avoid contractual obligations. As this Court noted in allowing Plaintiffs to add alter ego allegations, Defendants introduced this confusion "likely in the hopes that all three entities could avoid liability to the Funds." *See Demopoulos v. United Metro Energy Corp.*, No. 119CV05289FBRLM, 2022 WL 2390986, at *2 (E.D.N.Y. July 1, 2022), *reconsideration denied*, No. 19CV5289FBRLM, 2023 WL 2683012 (E.D.N.Y. Mar. 29, 2023). This context, as well as Plaintiffs' evidence, suffices to show Defendants' alter ego status.

14

### C. Relief

Based on the preceding discussion, Defendants must contribute to the Funds for drivers performing covered work under the 2010-13 and 2013-16 Master Contracts and for the five drivers initially chosen under the 2016-19 Master Contract.  To determine whether Defendants were delinquent, Plaintiffs are entitled to an audit and an injunction directing Defendants to "permit and cooperate in the conduct of an audit of its records." *Annuity, Welfare and Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFL-CIO v. Lori Contracting, Inc.*, No. CV 2014-2467(RJD)(MDG), 2015 WL 1321672, at *3 (E.D.N.Y. Mar. 5, 2015) (internal quotation marks and citations omitted), *adopted*, 2015 WL 1359072 (E.D.N.Y. Mar. 24, 2015).

As to the scope of the audit, the audit must be "no broader in scope than necessary to achieve its objective and no more extensive than the scope of the trustees' authority." *New York State Teamsters Conf. Pension & Ret. Fund v. Boening Bros.*, 92 F.3d 127, 134 (2d Cir. 1996).  Because Defendants are alter egos, Plaintiffs are entitled to audit all three Defendants' books and records to determine whether contributions are missing under the 2010-13 and 2013-16 Master Contracts.  However, because Defendants' obligations under the 2016-19 Master Contract are limited to the five drivers, Plaintiffs may only audit books and

15

SPA-16

records pertaining to those five employees.

At this stage, the Court does not express any opinion on whether Defendants are delinquent on any contributions.  Magistrate Judge Mann has already ordered that if the audit produces any dispute as to whether Defendants were delinquent in making contributions, additional discovery and a potential damages hearing could be required.  *See* ECF 16.

SPA-17

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion is granted, and Defendants'

motion is denied.  The Court issues an injunction allowing Plaintiffs to conduct an

audit of Defendants' books and records for the time period from March 1, 2013,

through December 31, 2018.  Because Defendants adopted the 2010-13 and 2013-

16 Master Contracts, Plaintiffs have the right to Defendants' books and records to

determine if Defendants failed to make Funds contributions for work covered by

the Master Contract.  However, because the Defendants adopted the 2016-19

Master Contract only with respect to the initial five drivers, Plaintiffs' audit right is

limited to those specific drivers.

**SO ORDERED.**


  /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
May 23, 2024

17